# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                      No. 22-cr-01322-JCH

ADAM MANN,

       Defendant.

## MEMORANDUM OPINION AND ORDER

On June 4, 2022, Albuquerque Fire and Rescue ("AFR") extinguished a fire that destroyed the interior of Defendant Adam Mann's home. While investigating the fire's cause, firefighters noticed two handguns in plain view. They alerted Albuquerque Police Department ("APD"), which sent a police service aide ("PSA"). The PSA entered the home—without a warrant—and seized the handguns. Around six weeks later, the FBI arrested Mr. Mann at his mother's home—with valid search and arrest warrants—for allegedly possessing a firearm after a felony conviction. The FBI obtained physical evidence and statements from this arrest.

In Mr. Mann's *Motion to Suppress Evidence Based on Constitutional Violations* (ECF No. 40), he argues that the seizure of the handguns violated the Fourth and Fourteenth Amendments. He seeks suppression of all evidence obtained, both from the seizure of the handguns at his home and from his arrest at his mother's home. Because no warrant, no exigencies, and no consent justified the PSA's warrantless entry on June 4, the Court will suppress the handguns and resulting firearm analysis. But the FBI would have inevitably arrested Mr. Mann at his mother's home, so the Court will not suppress evidence derivative to that arrest.

## I. Background

On June 4, 2022, AFR responded to a fire inside Mr. Mann's home. *See* Def.'s Ex. A, at 1 (ECF No. 40-1) (Fire Event Report); Def.'s Ex. E, ¶ 18 (ECF No. 40-4) (June 15 Search-Warrant Application). It is unclear who called 911 to alert AFR of the fire. Mr. Mann was not present when the firefighters arrived. Def.'s Ex. B, at 13 (ECF No. 40-2) (NFIRS Report). At an evidentiary hearing on September 5, 2023, FBI Agent Jordan Spaeth described a pole-camera video that showed Mr. Mann exiting his home as smoke appeared, ducking into nearby bushes, and walking away from his street as AFR arrived. *See* Gov.'s Ex. 1, at 1:00:40 to 1:01:53, 1:05:50 to 1:06:20 (Pole-Camera Video); Tr. Hr'g 33-35. Nothing suggests that AFR or APD knew, on June 4, 2022, the details of Mr. Mann's departure.

Around 10:35 a.m., firefighters entered through the unlocked front door. ECF No. 40-1, at 2; ECF No. 40-2, at 13. The fire was only in the kitchen. Tr. Hr'g 4. At 10:40 a.m., the fire was under control, and a primary search of the residence came back all clear. *See* ECF No. 40-2, at 13. At 10:57 a.m., a loss stop was called. *Id.* And at 11:00 a.m., a secondary search of the residence also came back all clear. *Id.*

AFR arson investigators arrived to determine the fire's cause. *Id.*[1] One investigator was Sean Quitz, who also testified at the evidentiary hearing. Tr. Hr'g 2. Investigator Quitz said that nobody was home but that the firefighters spoke to neighbors. *Id.* at 6, 17. They learned that the

---

[1] The June 15 search-warrant application alleges that Mr. Mann later told someone that "he burned his house while working on his Hummer." ECF No. 40-4, ¶ 19. No evidence suggests that AFR or APD knew, on June 4, that Mr. Mann accidentally started the fire. *See* Def.'s Ex. B, §§ E1-E2 (ECF No. 40-2) (NFIRS Report) (listing cause of ignition as "under investigation" and factors contributing to ignition as "undetermined"). In fact, AFR Arson Investigator Sean Quitz testified that he believed the fire started at the stove, but was not certain. Tr. Hr'g 14.

"occupant of structure was acting erratic within the last few days." ECF No. 40-1, at 2.[2] In addition, "[m]ultiple areas of gunshot damage were found to the home and vehicles parked there." ECF No. 40-2, at 13. Finally, the firefighters found "several unsecured firearms" in the house. *Id.* Investigator Quitz testified that the firefighters and arson investigators felt unsafe because of the bullet holes in the house and vehicles. Tr. Hr'g 8, 13, 17-18.[3] The firefighters called APD. *See* ECF No. 40-12 at 13; Def.'s Ex. C, at 1 (ECF No. 40-3) (Police Event Report).

APD sent a PSA, who arrived at 11:39 a.m. ECF No. 40-3, at 2.[4] The PSA did not have a warrant. *See* ECF No. 40-4, at 2 n.1. Video from the PSA's body camera shows someone, presumably an AFR employee, leading the PSA into the home and pointing to a handgun in a pile of ashes on the kitchen floor. Def.'s Ex. D, at 0:07 (ECF No. 41) (Lapel Video). The AFR employee and the PSA appear to be talking, but the video does not have audio until 0:29. After the audio starts, the PSA said, "alright let me get some gloves on; I'll have a look at it." *Id.* at 0:29. The PSA asked the AFR employee if he saw anyone, and the AFR employee answered that there was "nobody here." *Id.* at 0:35-:41.

---

[2] The June 15 search-warrant application states that someone called 911 on May 31. The caller alleged that a security camera showed Mr. Mann kicking a door, holding two handguns, and demanding the caller's vehicles. ECF No. 40-4, ¶ 17. Screenshots of this video are in the July 5 arrest-warrant application; a man who resembles Mr. Mann appears to be holding an object that resembles a handgun. Criminal Compl. 7 (ECF No. 1). Nothing suggests that AFR or APD knew, on June 4, any details of the May 31 incident other than general allegations of erratic behavior.

[3] Agent Spaeth testified that a pole-camera video showed a drive-by shooting on May 21 that caused bullet holes in Mr. Mann's house and truck. Tr. Hr'g 22-23. The Court has not seen this video; nothing suggests that AFR or APD knew, on June 4, about the drive-by shooting.

[4] A PSA's job is "to assist sworn personnel by performing nonhazardous duties within [APD] and to provide the community with a variety of community services, including assisting motorists, and responding to traffic crashes and calls for service that pertain to abandoned vehicles." Gov.'s Ex. 1, § 1-78-2 (ECF No. 49-1) (Albuquerque Police Dep't, General Orders § 1-78, Police Service Aide (PSA) Program (July 29, 2022)).

The PSA exited the house. Outside, the AFR employee appears to point out bullet holes in the house. *Id.* at 0:48. When the PSA came back inside, he picked up the handgun from the ashes on the kitchen floor. *Id.* at 3:40. The PSA next picked up a second handgun, perhaps from a counter. *Id.* at 3:52. Then the PSA left the house with the handguns. *Id.* at 4:30. The last firefighter left the scene at 1:46 p.m. ECF No. 40-1, at 3.

Inside the house, soggy ashes, insulation materials, rubble, trash, clothes, and some other personal belongings were strewn across the floors of the kitchen and living room. Def.'s Ex. D, at 0:30-:42. Investigator Quitz testified that some of the clutter likely preceded the fire. Tr. Hr'g 10. By contrast, Investigator Quitz said that pieces of drywall and ceiling were on the floor due to fire suppression. *Id.* According to Agent Spaeth, the city later condemned the house. *Id.* at 41-42.

Outside the house, several glass windows were broken. Def.'s Ex. D, at 4:08. Other than that, however, no major damage to the house's exterior is apparent. The house was not a pile of rubble—the roof and exterior walls remained standing, as did a garden fence.

**Figure 1.** Screenshot Showing House's Exterior. *Id.* at 10:56.



After the fire, APD retained custody of the handguns. ECF No. 40, at 3. According to the United States, Mr. Mann avoided his home in the weeks following the fire. *See* ECF No. 49, at 4. The United States acknowledges, however, that Mr. Mann returned home at night to retrieve items, including partially burned U.S. currency of more than $300,000. *See id.* at 6. Additionally, a screenshot from a neighbor's security camera shows Mr. Mann appearing outside of his home on June 13 and raising a middle finger to the camera. *See* Criminal Compl. 3, 7 (ECF No. 1). Agent Spaeth testified that Mr. Mann returned home in the middle of the night and on weekends in durations between twenty minutes and two hours. Tr. Hr'g. 26. According to Agent Spaeth, Mr. Mann would often enter through the back of the house. *Id.* at 41-43.

Agent Spaeth testified that he learned about the June 4 fire and a May 31 incident during the week of Monday, June 6, 2022. *Id.* at 24. (A security camera captured someone resembling Mr. Mann kicking his neighbor's door and holding an object resembling a handgun. *See supra* note 2.) Agent Spaeth said that he had been interested in Mr. Mann for some time. Tr. Hr'g 21. Earlier that year, Agent Spaeth ordered the installation of a pole camera to watch Mr. Mann. *Id.* at 22, 38. He observed a drive-by shooting on May 21 that presumably created bullet holes in Mr. Mann's house and vehicles. *Id.* at 22-23; *see supra* note 3. He also observed Mr. Mann using the house between May 21 and June 4. Tr. Hr'g at 23.

On June 15, FBI Special Agent Jordan Spaeth filed a search-warrant application. He sought to collect DNA swabs from Mr. Mann and to seize the handguns from APD. ECF No. 40-4, ¶ 21. He also requested retroactive permission for the seizure of two handguns from Mr. Mann's home. *Id.* ¶ 18 n.2 ("I believe that the APD did not secure a warrant to seize the two handguns nor conduct a search of the residence. I am requesting the court's permission to retroactively seize the two handguns seized by the APD on June 4, 2022."). The warrant was issued. *See* ECF No. 49, at 4.

On July 5, an arrest warrant was issued for Mr. Mann for alleged violations of 18 U.S.C. § 922(g)(1). *See* ECF No. 1; ECF No. 40, at 3. And on July 12, a search warrant was issued authorizing police to enter Mr. Mann's mother's home to arrest Mr. Mann. *See* Def.'s Ex. F, ¶ 3 (ECF No. 40-5).

FBI Agents arrested Mr. Mann at his mother's home on July 15. *See* Returned Arrest Warrant (ECF No. 4). The agents seized around $300,000 in partially burned U.S. currency, a brown powder that field-tested positive for heroin, and an off-road vehicle in which Mr. Mann had been spotted. ECF No. 49, at 4-5. Agent Spaeth also interviewed Mr. Mann after giving *Miranda* warnings. ECF No. 40, at 3.

## II.    Standard

On a motion to suppress, a defendant carries the burden to show that officers' actions implicated the Fourth Amendment. *See United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020). Then the government "bears the burden of justifying warrantless police actions." *United States v. Kendall*, 14 F.4th 1116, 1122 (10th Cir. 2021). To review evidence, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *Goebel*, 959 F.3d at 1265 (citing *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007); *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004)).

## III.   Analysis

The Fourth Amendment commands that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Lange v. California*, 141 S. Ct. 2011, 2017 (2021). A "reasonableness" standard thus governs the constitutionality of seizures. *Id.* And warrantless entries into a home—even with

probable cause—are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). Certain exceptions, however, may overcome this presumption of unreasonableness. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

## A. Standing

The United States first argues that Mr. Mann abandoned the handguns and thus lacks standing to challenge their seizure. ECF No. 49, at 5.[5] The United States has the burden to show, by a preponderance of the evidence, that Mr. Mann abandoned the handguns. *United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006). Abandonment occurs when someone "either (1) explicitly disclaimed an interest in the object, or (2) unambiguously engaged in physical conduct that constituted abandonment." *United States v. Garzon*, 119 F.3d 1446, 1452 (10th Cir. 1997). The United States concedes that Mr. Mann did not explicitly disclaim his interest in the handguns, so the United States must prove that Mr. Mann "unambiguously engaged in physical conduct that constituted abandonment." *Id.* Standing is analyzed "at the time of the search." *United States v. Higgins*, 282 F.3d 1261, 1271 (10th Cir. 2002). Thus, the United States must prove that Mr. Mann's conduct before or at the time of the search showed abandonment.

The United States asserts that Mr. Mann started the fire, knew about the fire, and fled to watch the firefighters from a concealed position. The United States adds that Mr. Mann left the front door unlocked, and windows were shot out. And after the fire, claims the United States, Mr. Mann avoided his home and the area so he could dodge law enforcement. *See* ECF No. 49, at 5-6.

"[R]easonable privacy expectations may remain in fire-damaged premises." *Michigan v. Clifford*, 464 U.S. 287, 292 (1984) (plurality opinion); *see also Michigan v. Tyler*, 436 U.S. 499,

---

[5] The parties and the Court use the term "standing" as "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).

505 (1978) ("People may go on living in their homes or working in their offices after a fire. Even when that is impossible, private effects often remain on the fire-damaged premises."). But a significant amount of fire damage can diminish a reasonable expectation of privacy. *See Clifford*, 464 U.S. at 292 (plurality opinion). An objective test applies:

> Privacy expectations will vary with the type of property, the amount of fire damage, the prior and continued use of the premises, and in some cases the owner's efforts to secure it against intruders. Some fires may be so devastating that no reasonable privacy interests remain in the ash and ruins, regardless of the owner's subjective expectations.

*Id.*

Here, the fire contributed to a messy clutter inside Mr. Mann's home. Pieces of the ceiling and drywall were pulled down, and soggy ashes were on the floor. Tr. Hr'g 10. Eventually (it is unclear when), the city condemned the house. *Id.* at 42.

Still, enough of the house survived to maintain a reasonable expectation of privacy. The property was a private residence rather than a commercial building. *See Clifford*, 464 U.S. at 296-97 n.7 (plurality opinion) (recognizing that privacy interests are "especially strong" in fire-damaged homes). The roof, exterior walls, and garden fence remained standing. *See supra* fig.1. And a passerby who looked at the home's exterior would not see much, if any, fire damage. *See* Tr. Hr'g 4 (testimony of Investigator Quitz) (stating that fire was contained in kitchen); Def.'s Ex. D, at 10:56. All in all, the fire did not eliminate Mr. Mann's reasonable privacy interest.

The possibility that Mr. Mann may have started the fire does not change the result. In *Michigan v. Tyler*, the government argued that the defendant abandoned the premises because he set the fire. *See* 436 U.S. at 505. Thus, the government argued, the defendant lacked an expectation of privacy when the fire department arrives. *See id.* The Supreme Court rejected this argument: "there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment . . . *because the fire might have been started deliberately.*" *Id.* at 506

(emphasis added). So even if it is true that Mr. Mann started the fire, he did not abandon his home within the meaning of the Fourth Amendment by doing so.

Nor did Mr. Mann forfeit his privacy interests by not "waiting for the fire department to arrive so he could guide them to the source of the fire and thereby assist their efforts to defeat it swiftly and safely." ECF No. 49, at 5. Assisting firefighters may be wise, but doing so is not necessary to retain privacy interests in a home. *See Tyler*, 436 U.S. at 505 (accepting that "most innocent most innocent fire victims are treated courteously and welcome inspections of their property to ascertain the origin of the blaze" but holding that this fact does not affect reasonableness under the Fourth Amendment). A resident may have different reasons—some reasonable and others not—for leaving a burning house while firefighters work to save it.[6]

The United States cites two cases where defendants abandoned residences, but neither supports abandonment here. In *United States v. Manning*, the defendant and his wife rented a house for one month but left after one day. 440 F.2d 1105, 1110-11 (5th Cir. 1971). They left the door unlocked, food on the table, and dishwater in the sink. FBI agents searched the house twenty-six days later. *See id.* at 1111.

It is true that *Manning* shares some facts with this case. Analogous to the mess in *Manning*, Investigator Quitz testified that the clutter in Mr. Mann's home preceded the fire. Tr. Hr'g 9-10. So too, the bullet holes in the house preceded the fire. *Id.* at 8. But "'the messy state of the house . . . ' [does] not 'add much to the equation,' because '[a] person's failure to keep an orderly home should not subject him or her to a warrantless search by police.'" *McInerney v. King*, 791 F.3d 1224, 1234 (10th Cir. 2015) (second alteration in original) (quoting *United States v. Martinez*,

---

[6] The United States contends that Mr. Mann left his home because "he knew he was a felon . . . and did not want to be associated with the pistols or get in trouble for possessing them." ECF No. 49, at 6. The United States has not proven Mr. Mann's motivations by a preponderance of the evidence.

643 F.3d 1292, 1297 (10th Cir. 2011)). And a key fact distinguishes *Manning*. Mr. Mann was not absent from his house for the twenty-six days before the fire. In fact, Agent Spaeth observed Mr. Mann using his home in the two weeks before—and morning of—the fire. Tr. Hr'g at 23, 33-34.

In the United States' second case, *United States v. Ferguson*, the defendant explicitly disclaimed an interest in his house. 33 F. App'x 849, 850 (9th Cir. 2002) (unpublished). Here, by contrast, the United States has recognized that Mr. Mann made no such disclaimer.

Finally, because standing is analyzed "at the time of the search," Mr. Mann's alleged conduct and the city's condemnation of the home after the fire are irrelevant. *Higgins*, 282 F.3d at 1271.[7] Thus, Mr. Mann abandoned neither his home nor the handguns, and he has standing to challenge the warrantless search.

### B.    Implication of the Fourth Amendment

Mr. Mann challenges the PSA's warrantless entry into his home. To repeat, warrantless home entries are presumptively unreasonable. *See Payton*, 445 U.S. at 586. And the fire did not destroy Mr. Mann's reasonable expectations of privacy in his home. *See Clifford*, 464 U.S. at 292 (plurality opinion). As a result, Mr. Mann has met his burden to show that the PSA's conduct

---

[7] Even if the Court considered Mr. Mann's conduct after the fire, this conduct would not unambiguously show abandonment of his home or its contents. Agent Spaeth stated that Mr. Mann returned to home—entering through the back—for twenty-minute to two-hour intervals at nights and on weekends. Tr. Hr'g 26, 43. The United States adds that Mr. Mann "return[ed] only at night to retrieve items like the partially-burned US Currency of more than $300,000." ECF No. 49, at 6. The Court reads the United States as suggesting that nighttime-only returns support abandonment.

To the contrary, returning home—even if only at night—shows a continued interest in the home and its contents. What is more, one of the United States' own attachments rebuts the claim that Mr. Mann returned only at night. In the July 5 arrest-warrant application, the United States included a screenshot from a neighbor's security camera that showed Mr. Mann appearing outside of his home on June 13 and raising a middle finger to the camera. *See* ECF No. 1, at 3, 7. The screenshot shows broad daylight.

implicates the Fourth Amendment. *See Goebel*, 959 F.3d at 1265. Thus, the burden shifts to the government to justify the PSA's warrantless actions. *See Kendall*, 14 F.4th at 1122.

## C.      Justifications for the Warrantless Entry

Because the PSA's warrantless search is presumptively unreasonable, the United States has the burden of rebutting this presumption and showing that an exception to the warrant requirement applies. *See United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006). "That burden is especially heavy when the exception must justify the warrantless entry of a home." *Id.* (citing *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998)). The United States' proposed justifications for the PSA's warrantless entry fall into three categories: (1) fire-related exigencies; (2) community caretaking; and (3) other exigencies, best described as threats to the public and officer safety.

### 1.      Fire-Related Exigencies

"A burning building of course creates an exigency that justifies a warrantless entry by fire officials to fight the blaze." *Clifford*, 464 U.S. at 293 (plurality opinion). And upon entering a building to fight a fire, firefighters may seize evidence of arson or other crimes that is in plain view. *See Tyler*, 436 U.S. at 509; *United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008). What is more, the constitutionality of this warrantless entry does not require active flames: "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." *Tyler*, 436 U.S. at 510.

Warrantless re-entries may be constitutional too. *See Clifford*, 464 U.S. at 293 & nn. 3-4 (plurality opinion). For example, in *Michigan v. Tyler*, a fire broke out just after midnight. A fire chief arrived to investigate the fire's cause at 2:00 a.m., when the fire department was "watering down smoldering embers." The chief suspected arson and called a police detective, who arrived at 3:30 a.m. The chief and the detective tried to take pictures of the building's interior, but smoke

11

and steam thwarted their efforts. By 4:00 a.m., the firefighters extinguished the fire and departed, along with the chief and the detective. But the detective and an assistant fire chief returned at 9:00 a.m.—without a warrant—and gathered evidence. *See id.* at 501-02. The Court upheld the constitutionality of this re-entry, reasoning that the darkness, steam, and smoke at 4:00 a.m. effectively paused the warrantless but constitutional investigation. Thus, the 9:00 a.m. re-entry was "no more than an actual continuation" of the initial entry. *Id.* at 511.

*Tyler* contrasts with *Michigan v. Clifford*, 464 U.S. 287. There, firefighters extinguished a house fire at 7:04 a.m. All firefighters and police left the scene. Two arson investigators returned without a warrant at 1:00 p.m. They searched the basement, where they found and seized evidence of arson. After determining that the fire began in the basement, the investigators searched the rest of the house. The full-house search yielded more evidence. *See id.* at 290-91 (plurality opinion). The Court held that the 1:00 p.m. search was not a continuation of an earlier search and that the re-entry required a warrant, consent, or the identification of a new exigency. *See id.* at 296-97.

Even when a fire justifies a warrantless entry or re-entry, however, any warrantless search "must be strictly circumscribed by the exigencies which justify its initiation." *Klump*, 536 F.3d at 118 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)). So when officials enter a house to fight a fire without a warrant, "the scope of the warrantless search is limited to that reasonably necessary to extinguish the blaze, determine the cause and origin of a fire, and ensure against rekindling." *Id.* (citing *Clifford*, 464 U.S. at 293 (plurality opinion)). And if officials exceed that scope, or if they return after a discontinued search, then any "subsequent post-fire search must be conducted pursuant to a warrant, consent, or the identification of some new exigency." *Clifford*, 464 U.S. at 297 (plurality opinion).

If a warrant is necessary, it can come in two varieties: a criminal search warrant or an administrative warrant. *See id.* at 294. Administrative warrants cover government conduct "beyond the paradigmatic entry into a private dwelling by a law enforcement officer in search of the fruits or instrumentalities of crime." *Tyler*, 436 U.S. at 504. For example, officials may use an administrative warrant when they seek "to locate and abate a suspected public nuisance, or simply to perform a routine periodic inspection." *Id.* This type of warrant is also appropriate when officials seek "to determine the cause and origin of a recent fire." *Id.*

An administrative warrant requires a less-demanding standard of probable cause than is necessary for a criminal search warrant. For administrative warrants, probable cause "exists if reasonable legislative, administrative, or judicially prescribed standards for conducting an inspection are satisfied with respect to a particular dwelling." *Clifford*, 464 U.S. at 294 n.5 (plurality opinion); *see also Camara v. Mun. Ct.*, 387 U.S. 523, 538 (1967). But even though the probable cause standard may be relaxed, the need for a warrant remains strict. *Tyler*, 436 U.S. at 506. Said otherwise, without exigencies or consent, officials need a warrant to enter a house— even if they have probable cause and non-investigatory purposes. *See Clifford*, 464 U.S. at 293 (plurality opinion); *see Camara*, 387 U.S. at 534.

By contrast, the issuance of a criminal search warrant requires "a showing of probable cause to believe that relevant evidence will be found in the place to be searched." *Clifford*, 464 U.S. at 294 (plurality opinion). To determine which type of warrant is necessary, "the object of the search determines the type of warrant required." *Id.*

Here, the PSA arrived thirty-nine minutes after a secondary search of the residence came back all clear and more than two hours before the firefighters departed. If the PSA's entry was fire-related, its timing would have made it constitutional. *Cf. Tyler*, 436 U.S. at 511 (upholding

warrantless re-entry five hours after fire extinguished to determine fire's cause). For fire to justify the warrantless entry, however, the scope of the PSA's search must have been "limited to that reasonably necessary to extinguish the blaze, determine the cause and origin of a fire, and ensure against rekindling." *Klump*, 536 F.3d at 118 (citing *Clifford*, 464 U.S. at 293 (plurality opinion)).

The United States admits that the PSA did not enter for fire-related reasons. The PSA did not seek to determine whether the handguns caused the fire or might rekindle the fire.[8] Instead, the PSA was present for "community caretaking"—to protect the public from "unsecured firearms in [an] unsecured house in a busy residential neighborhood at 11 a.m. on a Saturday morning." ECF No. 49, at 10. Because "[t]he object of the search is important even if exigent circumstances exist," and the PSA was not searching for the cause and origin of the fire, fire-related exigencies cannot justify the PSA's warrantless entry. *Clifford*, 464 U.S. at 294 (plurality opinion).

Two other points. First, although firefighters may seize evidence of arson or other crimes that is in plain view while they are lawfully inside a house for fire-related exigencies, *see Tyler*, 436 U.S. at 509, this plain-view rule does not justify the PSA's seizure of the handguns. Possessing handguns in one's home is presumptively lawful. *See District of Columbia v. Heller*, 554 U.S. 570, 635-36 (2008). And as the United States acknowledges, AFR "did not know or care" about Mr. Mann's prior felony conviction, and the PSA was not present to investigate a crime. ECF No. 49, at 8-9; *see United States v. Muhtorov*, 20 F.4th 558, 597 (10th Cir. 2021) (noting plain-view seizure requires that "it was immediately apparent that the seized item was incriminating on its face" (citing *United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002))).

---

[8] In fact, Investigator Quitz testified that the handguns did not cause the fire. Tr. Hr'g 14.

Second, even if the PSA had an administrative warrant to determine the cause and origin of the fire, this warrant would not have justified the PSA's conduct. The PSA was not present for firefighting or fire-investigation, so a different warrant (either a criminal search warrant or an administrative warrant for public safety), exigency, or consent was necessary for the PSA's entry.[9]

## 2. Community Caretaking

The United States next appeals to community caretaking. But community caretaking is not "a standalone doctrine that justifies warrantless searches and seizures in the home." *Caniglia v. Strom*, 141 S. Ct. 1596, 1598 (2021). In *Caniglia v. Strom*, the plaintiff's wife called the police to request a welfare check on her suicidal husband. The police seized the plaintiff and his handguns from his home without a warrant. After the plaintiff sued, the district court granted summary judgment to the police. The First Circuit affirmed "solely on the ground that the decision to remove

---

[9] Fourth Amendment analysis typically requires an objective inquiry into a government official's conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011). "Two 'limited exception[s]' to this rule are . . . special-needs and administrative-search cases, where 'actual motivations" do matter." *Id.* (first alteration in original) (quoting *United States v. Knights*, 534 U.S. 112, 122 (2001)). One example of an administrative search where officials' actual motivations matter is during an "execution of an administrative warrant authorizing . . . an inspection of fire-damaged premises to determine the cause." *Id.* (citing *Clifford*, 464 U.S. at 294 (plurality opinion)).

Here, the PSA's subjective motivations, as described by the United States, were for community caretaking and protecting the public from unsecured handguns. These motivations show that the PSA was not present to determine the cause and origin of the fire. Just as the United States cannot rely on fire-related exigencies to justify the PSA's warrantless entry, the PSA would have similarly exceeded the scope of an administrative warrant to determine the cause and origin of the fire.

Viewing the PSA's actions through an objective lens would yield the same result. The PSA entered the home, collected the handguns, and left. These actions, viewed objectively, do not suggest that the PSA entered the home to "extinguish the blaze, determine the cause and origin of a fire, and ensure against rekindling." *Klump*, 536 F.3d at 118.

Finally, even if the PSA was acting under the authority of an APD's administrative program, the PSA's warrantless search would still have been unreasonable under the Fourth Amendment. *See* ECF No. 49, at 9 (citing Albuquerque Police Dep't, General Orders § 1-78, Police Service Aide (PSA) Program (July 29, 2022)). Because administrative searches also require warrants, APD cannot authorize warrantless searches of houses, even for non-criminal investigations. *See Camara*, 387 U.S. at 534.

petitioner and his firearms from the premises fell within a 'community caretaking exception' to the warrant requirement." *See id.*

To define the community-caretaking exception, the First Circuit relied on *Cady v. Dombowski*, 413 U.S. 433 (1973). In *Cady*, as described by the First Circuit, the Supreme Court "upheld the warrantless search of a disabled vehicle when the police reasonably believed that the vehicle's trunk contained a gun and the vehicle was vulnerable to vandals." *Caniglia v. Strom*, 953 F.3d 112, 123 (1st Cir. 2020) (citing *Cady*, 413 U.S. at 446-48), *vacated* 141 S. Ct. 1596 (2021). The First Circuit then quoted *Cady*'s explanation that "police officers frequently engage in such 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Id.* (quoting *Cady*, 413 U.S. at 441). The First Circuit held that a community-caretaking exception to the warrant requirement permitted warrantless home entries. *See id.* at 124. This holding relied on community caretaking alone and disclaimed reliance on other exigencies. *See id.* at 122-23.

The Supreme Court vacated and held that community caretaking cannot independently justify warrantless home entries. *See Caniglia*, 141 S. Ct. at 1599-1600. The Court emphasized that "[w]hat is reasonable for vehicles is different from what is reasonable for homes." *Id.* at 1600.

Following *Caniglia*, community caretaking alone cannot justify the PSA's entry. Thus, the United States' two cases do not apply. In *United States v. Trujillo*, the Tenth Circuit relied on *Cady* to justify officers' removal of firearms from a car parked in public. *See* 993 F.3d 859, 873 (10th Cir. 2021) (citing *Cady*, 413 U.S. at 443). And in *United States v. Chavez*, the Tenth Circuit again recognized the community-caretaking doctrine for cars parked in public but declined to apply the doctrine to the facts presented in that case. *See* 985 F.3d 1234, 1243-45 (10th Cir. 2021) (citing *Cady*, 413 U.S. at 447-48). Because these two cases address cars rather than homes, they are

irrelevant. *See Caniglia*, 141 S. Ct. at 1600. Rather than community caretaking, therefore, the United States must cite specific exigencies to justify the PSA's entry.

### 3. Other Exigencies—Officer and Public Safety

The United States contends that the unsecured handguns created danger. The United States describes that Mr. Mann's home was unlocked with handguns "unsecured out in the open on a kitchen counter rather than safely stored within it," and that "it was the middle of a Saturday morning in the middle of a residential neighborhood next to a park and within a quarter mile of three schools." ECF No. 49, at 9. The United States also cites AFR's report: "Multiple areas of gunshot damage were found to the home and vehicles parked there, [and] several unsecured firearms were also found in the home with no one home." *Id.* (quoting ECF No. 40-2, at 13).

Exigencies that justify warrantless entries include an occupant's need for emergency assistance, threats to an officer's own safety, the "imminent destruction of evidence," and the risk of a suspect's escape. *Lange*, 141 S. Ct. at 2017 (quoting *Brigham City*, 547 U.S. at 403). The Court understands the United States' arguments to address threats to officer and public safety. The Tenth Circuit employs a two-prong test for this type of exigency: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *Najar*, 451 F.3d 710, 718 (10th Cir. 2006). This test is objective. "An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action." *McInerney,* 791 F.3d at 1232 (alteration in original) (quoting *Brigham City*, 547 U.S. at 404).[10]

---

[10] Because the test is objective, the United States cannot rely on the fact that the firefighters and arson investigators felt unsafe. Tr. Hr'g 17-18.

The United States has not cited a case holding that firearms in an unoccupied house—that law enforcement knew to be unoccupied—create an exigency that justifies a warrantless entry. In cases that the Court found where exigencies justified warrantless home entries to seize firearms, there was always at least the threat of an occupant. *Cf., e.g.*, *Najar*, 451 F.3d at 717, 719-20 (upholding warrantless entry where officers "had reasonable grounds to believe someone inside the trailer may have been in need of emergency aid and immediate action was required"; upholding seizure of firearm that was in plain view when officers reasonably believed occupant was a felon); *United States v. Taylor*, 179 F. App'x 957, 959 (7th Cir. 2006) (holding exigent circumstances justified warrantless home entry to seize firearm where defendant exited home but "police did not know if someone inside the home had access to the gun, or whether there might be injured persons inside the home"); *United States v. Burchfiel*, 432 F. Supp. 3d 1230, 1234, 1236 (D. Kan. 2020) (holding exigent circumstances justified warrantless seizure of shotgun from roof where officers had "probable cause to believe that the defendant was inside the house").

Consider, by contrast, *Arden v. McIntosh*, 622 F. App'x 707 (10th Cir. 2015). There, police received a call that the plaintiff was an imminent danger to himself. Officers entered his house without a warrant and assisted the plaintiff into an ambulance. The officers also seized firearms that were in plain sight, stored them at the police station, and returned them after the hospital discharged the plaintiff. The plaintiff sued under 42 U.S.C. § 1983. He conceded that the exigency of self-harm justified the officers' warrantless entry. But he argued that the seizure of the firearms after he left in the ambulance violated the Fourth Amendment. *Id.* at 708-09.

The Tenth Circuit agreed, at least within the scope of the posture on summary judgment. *See id.* at 710 ("The evidence and reasonable inferences therefrom interpreted in the light most favorable to [the plaintiff] are sufficient for a jury to conclude that [the officer's] seizure of his

firearms beyond the immediate need to protect officer safety during an emergency violated the Fourth Amendment."). The Circuit highlighted that the officers "had already determined that no one else was present in the home," and that "[t]here was no indication that [plaintiff's] possession of the guns was illegal." The Circuit also emphasized that "[t]he defendants have cited no authority, and we have found none, authorizing a police officer to confiscate weapons that would otherwise be left in an *unoccupied house*." *Id.*; *accord Harris v. O'Hare*, 770 F.3d 224, 236-27 (2d Cir. 2014) (holding combination of firearm in home and home's location in high-crime neighborhood, without more, does not create exigency).

Here, the firefighters knew no one was home. Tr. Hr'g 6; Def.'s Ex. D, at 0:35-:41. And even though the house had bullet holes and shot-out windows, the walls survived the fire. *See supra* fig.1. Nothing suggests that the handguns were visible from the street or otherwise known to the public. It follows that the United States has not shown, by a preponderance of the evidence, an immediate danger that someone would attempt to enter the house and injure themselves or others with one of the handguns. Following *Arden*, the unsecured handguns in the unoccupied house were not an exigency that justified the PSA's warrantless entry. *See* 622 F. App'x at 707.

The United States' concern that the house was near three near schools and a park is also unavailing. The house does not look like an attractive nuisance that would entice children. In fact, the United States has not even shown that children were in school—much less that students from those schools wander into neighborhood homes. And although the pole-camera video shows people enjoying the park, the United States has likewise failed to show that one of those people might enter Mr. Mann's home. *See* Gov.'s Ex. 1, at 1:15. At bottom, the combination of broken windows and proximity to a school or park does not create an exigent circumstance. Were it otherwise, many more homes would be subject to warrantless entries.

### 4. Conclusion to Justifications for the Warrantless Entry

The United States fails to rebut the presumption of unreasonableness that attached to the PSA's warrantless entry. As a result, the PSA violated the Fourth Amendment when he entered Mr. Mann's home without a warrant and seized two handguns.

### D. Exclusionary Rule

A judicially created rule "excludes evidence obtained in violation of the Fourth Amendment from being used at trial." *United States v. McCane*, 573 F.3d 1037, 1042 (10th Cir. 2009) (citing *Herring v. United States*, 555 U.S. 135, 140-41 (2009)). This exclusionary rule may suppress evidence that is "fruit of the poisonous tree"—evidence discovered as a direct result of unlawful activity. *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006). But the exclusionary rule "applies only where it results in appreciable deterrence." *McCane*, 573 F.3d at 1042 (quoting *Herring*, 555 U.S. at 700).

Exclusion will yield insufficient deterrence when police act in good faith or would have inevitably discovered the evidence at issue. *See, e.g.*, *United States v. Leon*, 468 U.S. 897, 906 (1984) (recognizing good-faith exception to exclusionary rule); *Nix v. Williams*, 467 U.S. 431, 444 (1984) (recognizing inevitable-discovery exception to exclusionary rule). The United States contends that both good-faith police action and inevitable discovery are present.

### 1. Good Faith

A court will not exclude evidence that officers obtained unlawfully but while acting in good faith. *See Davis v. United States*, 564 U.S. 229, 238 (2011). The good-faith exception to the exclusionary rule applies when police 'acted in objectively reasonable reliance on some seemingly immutable authority,' i.e. 'a neutral third-party's authorization.'" 3 Wayne LaFave, *Search & Seizure* § 1.3(g), at text accompanying nn. 84-87, Westlaw (database updated Oct. 2022) (quoting

*United States v. Katzin*, 769 F.3d 163, 189-90 (3d Cir. 2014) (en banc) (Greenaway, J., dissenting)). *Compare Leon*, 468 U.S. at 916 (holding evidence admissible when police relied on defective warrant—that is, a magistrate judge's error), *with United States v. Loera*, 923 F.3d 907, 925 (10th Cir. 2019) ("[T]he good faith exception does not apply in a case like the one before us because the illegality at issue stems from unlawful *police* conduct, rather than magistrate error."). The government has the burden to show that the good-faith exception applies. *United States v. Corral-Corral*, 899 F.2d 927, 932 (10th Cir. 1990).

The United States does not argue that the PSA acted in good-faith reliance when he seized the handguns.[11] Instead, the United States suggests that Agent Spaeth relied in good faith on the June 15 search warrant to get the handguns from APD. *See* ECF No. 49, at 11; Tr. Hr'g 25. The search-warrant application stated: "I believe that the APD did not secure a warrant to seize the two handguns nor conduct a search of the residence. I am requesting the court's permission to retroactively seize the two handguns seized by the APD on June 4, 2022." ECF No. 40-4, ¶ 17 n.2.

To begin, warrants requested after an unconstitutional search or seizure cannot retroactively cure earlier constitutional flaws. *See Whiteley v. Warden*, 201 U.S. 560, 565 n.8 (1971) ("[A]n otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate. . . . A contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless. (citation omitted)); *see also United States v. Grubbs*, 547 U.S. 90, 99 (2006) ("The Constitution protects property owners . . . by interposing, *ex ante*, the 'deliberate, impartial judgment of a judicial officer . . . between the citizen and the police' . . . ." (second

---

[11] Any such arguments are therefore forfeited. *See United States v. Elliott*, 684 F. App'x 687, 688 (10th Cir. 2017).

alteration in original) (quoting *Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963))); *State v. Atwood*, 180 A.3d 1119, 1122 (N.J. 2018) ("Search warrants are prospective in nature—they authorize the taking of action. A later-obtained search warrant does not retroactively validate preceding warrantless conduct that is challenged through a suppression motion focused on the legitimacy of the seizure that gave rise to a later search.").

Despite this well-settled rule, the United States seems to argue that Agent Spaeth believed in good faith that the June 15 search warrant allowed him to retrieve the handguns from APD. Tr. Hr'g 25. As a result, the United States suggests, the good-faith exception applies and the evidence is admissible. *See id.*; ECF No. 49, at 11. Even accepting Agent Spaeth's good-faith belief, however, this argument fails. The constitutional violation occurred when the PSA entered Mr. Mann's house without a warrant to seize the handguns. Agent Spaeth's later good-faith reliance aside, the handguns were direct fruits of a constitutional violation. The tree was already poisoned.[12]

### 2. Inevitable Discovery

"When evidence is obtained in violation of the Fourth Amendment, that evidence need not be suppressed if agents inevitably would have discovered it through lawful means independent from the unconstitutional search." *Loera*, 923 F.3d at 928 (citing *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014)). The government has the burden to prove, by a preponderance of the evidence, that police officers would have otherwise and lawfully obtained the evidence. *Id.*

---

[12] The United States contends that Mr. Mann forfeited the argument that the June 15 search warrant was invalid and that Agent Spaeth did not execute it in good faith. ECF No. 49, at 11 There are procedural and substantive flaws with this contention.

Procedurally, the United States overlooks that it has the burden of raising the good-faith exception to the exclusionary rule. *See Corral-Corral*, 899 F.2d at 932. Thus, defendants need not presumptively rebut good-faith arguments in their motions to suppress.

Substantively, Mr. Mann does not rely on the June 15 search warrant as the unconstitutional action that requires suppression. The unconstitutional action from which Mr. Mann seeks suppression is the PSA's June 4 search of his house.

The "ultimate question" is "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant." *Christy*, 739 F.3d at 541, 543 (quoting *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000)). Four factors help show inevitable discovery:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Id.* at 541 (quoting *Souza*, 223 F.3d at 1204).

Here, nothing suggests that APD had a criminal investigatory interest in Mr. Mann or the handguns on June 4. *See* ECF No. 49, at 9. Thus, the only warrant that might have led to a lawful seizure of the handguns on June 4 would have been an administrative warrant for public safety.[13] Applying the four factors above, APD never began securing an administrative warrant. Second, it is unclear whether there was probable cause that the handguns presented a danger to the community such that police needed to seize them for public safety. Third, a warrant was ultimately obtained, but that was a criminal search warrant after the FBI became interested in Mr. Mann— eleven days after the fire. Fourth, nothing suggests that the PSA or APD 'jumped the gun' and sought to force the issue by seizing the handguns. *See id.* All in all, these factors do not suggest that the handguns would have been seized with a lawfully issued administrative warrant.

What about a criminal search warrant? Because nothing suggests that APD had a criminal investigatory interest in Mr. Mann or the handguns on June 4, there is no reason to think that APD would have applied for or received a criminal search warrant around that day. On the federal side,

---

[13] Note 9 and accompanying text, *supra*, explains why an administrative warrant to determine the cause and origin of the fire would not have justified the PSA's entry.

Agent Spaeth testified that he had been interested in Mr. Mann for some time, and he learned about the fire the week of Monday, June 6. Tr. Hr'g 21, 24. But he did not obtain a search warrant until June 15. *See* ECF No. 40-4, at 1. So in the eleven days between June 4 and 15, the handguns might have disappeared from the house. Currency was removed after the fire; the handguns might have been too. Thus, there is no evidence that a criminal search warrant would have been timely sought and issued so that police would have inevitably discovered the handguns. As a result, the Court will suppress the two handguns and the resulting firearm analysis.

The other physical evidence (the partially burned U.S. currency, a brown powder, and an off-road vehicle) and statements obtained during the July 15 arrest are another matter. APD's possession of the handguns was not necessary to establish probable cause in the June 15 search warrant, July 5 arrest warrant, and July 12 search warrant. For example, the June 15 and July 2 warrant applications both reference the May 31 incident in which a security camera captured Mr. Mann holding an object resembling a handgun. *See* ECF No. 40-4, ¶ 17; ECF No. 1, at 2, 6. The July 12 warrant application uses facts that connect Mr. Mann to his mother's home. *See* ECF No. 40-5, ¶¶ 8-9. And in any event, because the firefighters saw the handguns in plain view while lawfully inside Mr. Mann's home, their observation was acceptably referenced in the June 15 search-warrant application. *See* ECF No. 40-4, ¶ 18. This evidence is not fruit of the poisonous tree, so the Fourth Amendment does not bar its admissibility.

**IV.     Conclusion**

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that Adam Mann's

*Motion to Suppress Evidence Based on Constitutional Violations* (**ECF No. 40**) is **GRANTED IN**

**PART AND DENIED IN PART**:

1.  The Court will **SUPPRESS** the handguns and firearm analysis; and

2.  The Court will **NOT SUPPRESS** other physical evidence and statements obtained

    during the July 15, 2022, arrest of Mr. Mann.


_____
SENIOR UNITED STATES DISTRICT JUDGE